al. My name is Alan Kansas. I represent Wanda Rogers, the appellant in this case. Ms. Rogers is here in the courtroom today. We both appreciate the opportunity you've given us to argue the case before you. Ms. Rogers was terminated from her job as a closing notary doing residential real estate transactions following the extension of her time for service in the Grand Jury in the Eastern District of Louisiana. Ms. Rogers' case presents one claim, that she was terminated because of her Grand Jury service in violation of the Jury Service Improvement Act. By reason of? By reason of is the actual language in the statute, correct. And you're accepting that the gross but-for standard applies? That's not part of your argument to us. That's not part of my argument. I don't necessarily agree with gross, but we're not going to go there today. And even applying but-for causation, we think that Ms. Rogers' case should have withstood some re-judgment. Well, but-for causation, as well than gross, had a determinative effect. It's not a sole cause standard. It was a factor, but it was a factor that had a determinative effect. I do believe that gross—Well, I think that, for you, that's probably the most favorable statement of that standard. Thank you, Your Honor. I was going to mention that. We don't believe that but-for cause means sole cause. That's the first issue that this Court has to decide on this appeal. The defendants— That is a little higher hurdle than saying that it was a factor. I mean, it seems like probably centuries. But-for the defendant's negligence, the injury wouldn't have happened. And it's clear that there are many cases where there are numerous actors who are found liable for their negligence, that but-for their negligence, the plaintiff's injuries wouldn't have happened. So at the trial court here, the defendant expressly argued to the district court that but-for means that the plaintiff must prove that she was discharged exclusively because of her jury service. But again, just to clarify your argument to us, because it looks like the district court didn't adopt that sole or only. The district court even goes so far as to say, I don't even see that it's a motivating factor. Well- So we aren't being asked to discern legal error, even if it was urged to the district court. Is that correct? Do you remember the district court's ruling saying, I don't even think it was a motivating factor? I do. And I do, Your Honor. And I think that it's telling that that came after the district court said that defendant has provided undisputed evidence of a legitimate reason for termination such that the plaintiff's jury service cannot be but-for cause of her termination. Everything after that- The court said the court is suspect that her jury service was even a motivating factor. I understand. And I think that once you say that if the defendant presents undisputed evidence of a legitimate reason, that the plaintiff's jury service cannot be the but-for cause of termination, everything after that is essentially dicta. That if you cannot dispute the defendant's legitimate reason, if you cannot deny the facts upon which the defendant has articulated a nondiscriminatory reason, then the jury service cannot be the but-for cause. So while there was some discussion, admittedly, after that passage in the district court's opinion- The court, in this case, goes on to look at the pretext third prong anyways. And that's where I want to go this morning, too, because I understand this is a de novo review, and I don't want to waste time on but-for cause doesn't mean sole cause. It was argued by the defendants in the district court. They haven't repeated that in their briefs here. They haven't repeated- Looking at the legitimate reason, which you can see the unprofessional statements made. Correct. Nevertheless, that's pretext because- Thank you. And I hope that you have a little timeline that I- Well, we have it, but you just presented it this morning. We've been sort of busy, so I'm sure none of us have- Well, I provide it because the dates are important, the situation is complicated, and I thought it might be helpful, as I was trying to plan to go through this last night, that it would be helpful to have the dates and the facts this morning. And these are all facts that are in the- They may be facts. I skimmed them, but it's a highly selective set of facts. And I understand that, but look, we're deciding a case on summary judgment, and I think that the inferences have to go in favor of the non-moving party. So the dates are important because we're talking about discrimination because of jury service. So when Ms. Rogers was initially summoned to jury service, that was back in August 19, 2011. She gets a summons. Now, when she got the summons, she reported it to her human resources and reported it to her management, and it's important that right off the bat, human resources and her management made comments to her insinuating that she should go to the court and lie in voir dire so that she would not be selected for the jury. I don't think they understood grand juries, but that's what they told her. The HR representative insinuated that you should not tell the truth so that you should not be on the jury. Another manager says- You'll know these facts much better than I do, but had she, prior to those emails, indicated to them she was looking for a way to get out or not? Well, she had indicated, yes, that she wasn't happy with the fact that she was going to be on jury duty. Now, whether she really didn't want to be on jury duty or whether she was trying to- Okay, so there's a colloquy about that unfortunate circumstance in their minds. What the second related question is, those that sent the emails that were arguably responsive to her inquiry, were any of those the decision maker in the ultimate termination? The two decision makers were Haas and what's the other guy? Not according to the evidence provided by the defendants, and I think- Not according- One of them was gone already, and one of them was gone at or near the time, so I can't- Okay, and just on timing, you'll have thoughts on it, that the ultimate termination decision is not as close to her indicating to them that her duty is going to be extended. I agree. Whereas, it's right after the second unprofessional statement. Is that correct? Yes. So what do you- None of which is on the chart. No, yes. You don't have the statements on the chart, or you don't have the email- No, I don't have the statements. I was trying to keep the chart short so we could focus on the chronology and trying to weave in some of the additional statements. Well, that is a chronology that's pretty critical. I understand. So the first comment that is admittedly an unprofessional comment came on August 31, 2011. The entities involved in employing Ms. Rogers, it's a complicated story of joint ventures and two operations with different doing business as names working as part of the same company, but not wanting the customers to know that they were part of the same company. And I implore you to reread the brief. It does a better job than I can try and explain to you orally. But the gist of the August 31st meeting was that Ms. Rogers was presenting on behalf of Platinum Title to a meeting that was a combination of former Sterling real estate agents who had been associated with Platinum Title through a prior joint venture. And Ms. Rogers, her office for Platinum was in the same office. That business had been purchased by Ladder & Bloom. The Sterling real estate agency was being combined with the Ladder & Bloom real estate agency. Ladder & Bloom was essentially stepping into the shoes of Sterling also with regard to the Platinum joint venture with TRG. I told you it was complicated. And Ms. Rogers was going to present on behalf of Platinum at this meeting where, unbeknownst to her, the Ladder & Bloom president was going to announce that the office manager for the Ladder & Bloom real estate agency was leaving and that he had selected the office manager for Sterling to head the new combined agency. A lot of the agents were upset about that, had heard about it ahead of time. It was a very difficult, tense situation. And Ms. Rogers was put up there to lead the first session of the meeting with a discussion. And she is associated with Platinum. So she froze. She blanked. She tried to tell a joke to break the ice. She didn't even get through the whole joke. She stopped and moved on with her presentation. After the meeting, and this is important because this is August, the end of August of 2011, no one, not one employee of TRG or Bromac or Platinum came to Ms. Rogers and said, you should not have said that. You did wrong. You may be fired if you do something like that again. Not even close. There was no written discipline, no oral discussions. The only follow-up was with Mr. Haas, the Ladder & Bloom president, who held no position within Bromac, the current employer. And the discussion was, and the office manager, the new office manager, between Ms. Rogers and them was, a mutual, that didn't work out very well. We shouldn't have sent you in front of that hostile audience. You shouldn't have said that. Ms. Rogers says, I agree, I shouldn't have said that. And to this day, she understands she shouldn't have said that. Now, that happened in August 31, no response from her manager, no response from her superiors, no write-ups, no anything. Then, October 13, 2011, Ms. Rogers is for the first time made an active member of the grand jury, meaning that not only does she, that she has to be ready to show up every Friday. Before then, she was an alternate member. There was no duty to miss work, to do anything. Now, she has to wait to find out at the end of the business day on Wednesday whether or not she is needed to come to grand jury service on Friday, which means as a real estate closer, she can't schedule any closings for Friday until Thursday or late Wednesday night, effectively meaning she can't really schedule these things because they have to be scheduled more than a day in advance. What's the process for being chosen to be a member of the grand jury as distinguished as a petty jury? That I don't know, Your Honor. Now that it happened, did she volunteer to do that? No, she got a summons to appear and you show up when you get a summons from the federal court. The original summons, it says jury duty, but it was for grand jury service, right? Yes. So it's an 18-month thing every time. What I think is that it was a six-month thing that always gets extended. So when she first was summoned in August. Your time is a bit short, so you may want to get to your other major points. Thank you. So when we're talking about evidence of pretext, you have this nothing happens in response to what is admittedly an improper comment. No discipline. Then in mid-February, or then she gets made a regular member of the grand jury. Then in mid-February, that service is extended through the following August, and all of a sudden you have her office mate, not her supervisor, starting to send e-mail reports to the people at TRG and BROMAC, and their response is, get that information so we can write Wanda up. And this is before the second incident, before the incident that she was terminated immediately after. It was after she notified them of the extension of her grand jury service and before she made this second comment. So they're writing e-mails, two or three e-mails, please give us that information so we can write Wanda up. In their depositions, they could not definitively say what it was that they wanted to write Wanda up about. They guessed that it was the comment way back that they say was in November that we say was in August, but then they also say that we already wrote her up on this. So these are inconsistent and suspicious activities. This looks like papering the file. We're out here with e-mails. We need that information to write her up. Judge Berrigan, did she have the evidence relating to your client's statement to the Louisiana Workforce Commission that she thought the reason she'd been fired had to do with salary or even the comments? She had that information, but that same, she also had the entire package of information provided to the Workforce Commission that also stated that she was terminated because of her jury service. And defendants tried to say that because she states that there was one other reason that can't be the sole reason. Or two, right? Or two. Trying to make salary cuts, and I made an unprofessional statement. But, okay. Okay, go ahead. I'm about out of time. The second comment, please, was just that if you need help on the weekends or after hours, if I'm not drinking, I'll answer the phone. This came a week or so after prior comments that were much worse that are in the records that weren't responded to. The rest of my time, I guess, I reserve for rebuttal. Thank you. All right. Ms. Boyle. Good morning, Your Honors. May it please the Court. My name is Kim Boyle, and I represent the defendant, Apolise Bromack Title Services and Title Resource Group. Your Honors, based upon a summary judgment record that was actually developed in the district court, Apolise respectfully requests that this court affirm the summary judgment ruling under the Jury Service Improvement Act. The appellant has failed to raise a genuine issue of material fact to preclude summary judgment under the but-for causation standard which is required by the Act. As this court noted, the statute specifically refers to by reason of. Courts have interpreted by reason of to mean because of, on account of, based upon, etc. This whole issue of the sole factor or was it one factor, etc., Your Honors, I think can be kind of summed up based upon this court's own ruling, recent ruling, I might add, in September of 2013 in the Iron v. Chevron case. This court specifically stated that based upon the Supreme Court's holdings in Gross, 2009, and in Nassar, summer of 2013, that the mixed-modus framework had limited application. That's because the Supreme Court in both cases said that but-for is a heightened level of causation and does not allow for the motivating factors test that we believe that the appellant was attempting to rely upon in this present case. In appellant's brief, and I will talk about the brief submitted to this court, because initially in response to the motion for summary judgment, appellant did not file a detailed memorandum in opposition to the motion for summary judgment, and the record is clear on that. In regard to the causation standard, do you agree then that the question is whether or not the plaintiff here pointed to a fact issue regarding whether or not her jury service was a determinative factor in her being discharged? I believe, Your Honor, that the standard is whether the plaintiff has put in this record or created a genuine issue of material fact that she meets the but-for causation standard. I know, and I'm formulating the but-for standard in one that it is a – her jury service in this case was a determinative factor in her being terminated, which that determinative factor is the part of that same but-for causation. Well, I do recall, Your Honor, that I believe in the gross decision the Supreme Court relied upon some language in Hazen and used determinative influence as opposed to kind of a strict language related to but-for. But I think that the appellant in this case is not referring to this determinative influence. The appellant's initial response concerns whether or not it's a motivating factor, i.e. under the mixed-modus test. And I believe, Your Honor, that that is different. Oh, I'm sorry. I brought a distinction between a motivating factor. As I understand the law, to persuade a jury that only that a motivating factor along with other factors was what caused her to be fired or comments and so forth, she loses. But if they could persuade the jury that the jury service here was a determinative factor, that's why she was fired. The fact that she flips it over, that they may have disliked other things she was doing or comments and so forth, but the thing they fired her for was that. That, to me, is what the formulation is. Now, if that is the standard, my question is, why is this a jury question here? Well, Your Honor, it's not a jury question because many of these cases are decided by summary judgment on a regular basis. Even accepting the burden-shifting mechanism of McDonnell Douglas, the defendant's appellees put forth a legitimate business reason as to why she was terminated. That legitimate business reason related to her conduct and basically her unprofessional conduct in the workplace. There are a host of cases, as this Court is aware, in which summary judgment has been found and affirmed based on the fact that the plaintiff cannot substantially create a genuine issue of material fact other than the plaintiff's reliance upon her own subjective speculation, conjecture, etc. And basically, Your Honor, that's exactly what we have here. We have this timeline that I was given this morning prior to oral argument, but as noted, this timeline relies upon certain specific facts but does not include other relevant facts. This, to my knowledge, was not included in the record before the trial court. Moreover, Your Honor, for purposes of determining whether or not the trial court's decision was correct under the normal summary judgment standard, again, plaintiff did not file an actual formal memorandum initially in opposition to the motion for summary judgment. Our motion for summary judgment addresses the but-for causation standard, but it also addresses the but-for causation standard under the McDonnell-Douglas burden-shifting framework. So Judge Berrigan considered it on your motion and your memorandum, but it was unopposed to the extent that a brief in opposition wasn't filed? There was a response initially filed where the plaintiff objected to and attempted to raise genuine issues of material fact. That initial opposition did not include a memorandum, and we state that point blank in our reply memorandum in support of the motion for summary judgment. Then plaintiff came back approximately a day or two after we filed our reply memorandum and filed a quote-unquote response to our reply memorandum. In that memorandum, that was the first memorandum in which the appellant attempted to discuss some of these legal causation standards under Gross, under Nassar, etc., Your Honor. But the original opposition, as required by the local rules of the Eastern District, did not contain a memorandum, though there was a statement of what plaintiff contends were objectionable facts.  Yes, Your Honor. The district court based its ruling on any of these what you suggest are procedural inadequacies. I thought the district court based it on the basis that there was no genuine issue of fact here with regard to her being terminated because of her jury service. That is exactly correct, Your Honor. The district court did not base her ruling on any procedural issues. When they raised it and didn't raise it, he credited it all and then still filed against her. I thought that's what they did. That is correct, Your Honor, and I apologize if it appeared that I was misrepresenting what occurred. I would suggest you were. I would suggest the accuracy of what you said. I was just adding to that. That being so, the district court didn't rely on those procedural inadequacies. It looked at everything that was before them and then said, I don't think that there's a genuine issue of fact. And that is exactly what the district court did. As the court recognizes, the district court applied the Bud Far standard with Gross and with Nassar. But then the district court comes back and says that even if we look at some type of burden shifting, the court specifically relied upon the Evans versus City of Houston case where the McDonnell-Douglas burden shifting was actually applied. The district court said that there was a legitimate business reason for the termination. And more importantly, Your Honors, it is important to note temporal proximity. Plaintiff attempts to rely upon temporal proximity to say that the plaintiff or the appellant was terminated based upon some timeline. The real temporal proximity relates to the fact that Ms. Rogers makes this comment on April 18th in front of the Ladder and Bloom agents, etc. She's terminated two days later on April 20th. That's the relevant temporal proximity. And the court cites a case where it basically says that plaintiff is not in a position to prove pretext based upon temporal proximity unless the plaintiff can put forth substantial other reasons as to why it appears to be pretextual. There's nothing pretextual about a two-day difference between her making what that employer deemed to be inappropriate on professional comments eight months or six months, whatever timeline we want to use, after she previously made what were clearly inappropriate professional comments. And as this court is aware and as this court has ruled on a number of different occasions, the issue is not whether or not the employer's decision was arbitrary or capricious. The legal issue is not even whether that decision was incorrect. Instead, the issue is whether or not the employer did, on a but-for basis, base its decision on an illegal reason. Here, the employer did not base the decision on an illegal reason, i.e. being Ms. Rogers' service on the grand jury in the Eastern District of Louisiana. Now, in moving forward, Your Honor, bottom line is Judge Berrigan further went on to talk about some of the things that occurred. She does talk in her ruling about the fact that this initial comment was made in front of other people, in front of these Ladder and Bloom agents. And it is important to note what the comment was for purposes of the plaintiff's argument about pretext. She specifically stood up in this initial meeting where they're trying to sell the brand, and that is in the record, where they're trying to solicit business from these agents, that is in the record, Your Honors. And she says, raise your hand if any of you have ever engaged in unprotected sex. And that's a slight paraphrase, but I think that's the gist of what Ms. Rogers said to the room full of people. Also in the record is the fact that Rick Haas, who is the CEO of Ladder and Bloom, literally gasped out, what? This wasn't just a reaction of, oh, no big deal, etc. Ms. Rogers testified in her deposition that Rick Haas, the CEO of Ladder and Bloom, gasped, what? What's further in the record is the fact that Ms. Rogers apologized to Mr. Haas. She apologized to Meg Adams. She also apologized to the Ladder and Bloom agents who were in the room. She also committed that it would not occur again. Further- So the record is undisputed that there were disciplining encounters thereafter, Haas, with her to go over this incident? Well, I will say, Your Honor, that the record is clear that she spoke with Haas, and it was made clear that this should not occur again. And she admits that she was not supposed to make any other inappropriate comments. Now, the appellant has raised an issue that it was not documented, it was not all four corners of a document, etc., etc. However, Your Honor, an employer does not have to write out, type out, put everything- I thought there was an email with her supervisor, Peterson. Was that related to this? There is an email. What does that relate to? There is an email in November with the supervisor, Peterson. The reason, Your Honor, I didn't initially bring that up, because obviously the appellant has said that there's a genuine issue of material fact as to whether or not that related to this actual incident. Notwithstanding whether or not that related to this actual incident, and the people at PROMAT testified that it did. But notwithstanding that, plaintiff has not and cannot dispute the fact that there was a negative reaction to her making this comment in the room full of people. In fact, Your Honor, you referred to the Louisiana Workforce Commission documents in her detailed explanation to the Louisiana Workforce Commission. She specifically states there was a negative reaction by the people in the room. So that is a specific acknowledgement and admission by Ms. Rogers' part that there was a negative response, and it impacted people's perception of her in moving forward. So I think that basically we can assume that under relevant Fifth Circuit case law, that employer has the ability and the right to say, we don't believe that those are the appropriate types of comments. And obviously, we would like you to exercise some judgment and not use that again. Now Ms. Rogers focuses on the fact that, or attempts to focus on the fact that her grand jury service was extended. And I would like to briefly address that issue. There was a letter dated again in the record and attached to the defendant's motion for summary judgment. I believe that it's in Global Exhibit possibly 30, in Global Exhibit 30, in which there are two letters. Dated February 10th, one to Ms. Rogers and one to the employer, saying that her grand jury duty would be extended possibly for another six months. That was given, presumably by Ms. Rogers, in February. And in fact, this timeline that Mr. Kansas says, it was given to the employer in mid-February. However, nothing occurred during that time period. Nothing occurred that impacted her employment status during that time period. In fact, nothing occurred that impacted her employment status, i.e. an adverse employment action, the entire time she was doing grand jury service. Based upon the record evidence for purposes of the defendant's appellee's motion for summary judgment, the last time she appeared before the grand jury was March 23rd, 2012. Almost a full month or certainly four weeks prior to her termination on April 20th, 2012. And again, coming two days after, she makes the second inappropriate comment of, and again, I'm paraphrasing. You can call me on the weekends at home and I'll pick up the phone unless I'm drinking. Now, Ms. Williams. Yes, Your Honor. Ms. Wall, what about the allegation that she couldn't schedule these closings on Friday because she wouldn't know until late Wednesday whether she needed to appear? Well, first of all, Your Honor, and that is simply that, an allegation. That's simply Ms. Rogers' own speculation and conjecture about scheduling closings on Friday because that's allegedly the most popular day. There was never any evidence that she could not complete these closings or that someone else was taking her business? Your Honor, ask that. First of all, there is record evidence to the following effect. First of all, she was specifically told by her supervisor, Karen Peterson, that if you have any problems or any conflicts, call Paul's office. That means Paul Oncoff, and see if they can go over and help you. I.e., I think the language used, try to coordinate with Paul's office for purposes of scheduling closings. However, she testified, I'm sorry, Your Honor, she testified in her own deposition, which is part of the record evidence for purposes of this motion for summary judgment, that there was not a high volume and she did not remember, I believe, a specific instance in which she could not close based upon that. In fact, I believe that the record evidence is to the effect that really, there was a low volume and a low capture rate in the Mandeville office during this entire time period. So there wasn't any high volume of closings that couldn't take place on Fridays in that Mandeville office. And related to that, Your Honor, I would also like to address what the appellant deems to be pretext related to a monster.com advertisement, because that is in the brief. And I would like to address that more specifically. First of all, the monster.com advertisement did not relate to the appellant's position in the Mandeville office. There was specific testimony that they were trying to hire someone else. Then it was modified in November to relate to hiring someone in the Baton Rouge office. But the more relevant fact related to this, and the fact that, and it is clear that Ms. Rogers was fully aware of the fact that this was not an attempt to get rid of her because of jury service, is the fact that she sent an email dated October 19th, which is in the record. And in that email, she's on the subject line of that email says, I believe, jury duty and new hire or something to that effect. She specifically asked in that email whether they know when a new closer is going to be hired in Mandeville. She makes that, the subject line is jury duty and new hire. The email was sent to Oncoff, Peterson, Moore, Aguilar, Mullin, Haas, and Gilliam. And this is a direct quote. Does anyone have any idea when we will have another closer hired for the Mandeville office? So this whole idea that there was some pretext going on with the monster.com ad, etc. It simply is not supported by the record evidence before the court, before the district court. Also related to the fact, I can briefly go through some of the issues with the timeline that was presented by Counsel for Ms. Rogers this morning. Obviously, there are a number of things missing that are part of the record evidence. One is the fact that the jury policy was given to Ms. Rogers when she first told them that she was going to be going to jury duty. The HR manager, Jennifer Gilliam, told her how to fill out her time sheets. She was paid her full salary when she was out on jury duty. She was even allowed to keep the jury duty checks while she was out on jury duty. Moreover, the fact that, again, she asked when the new closer would be hired, as well as the fact that she tells the workforce commission, and this is extremely relevant, your honors, that she was fired to reduce salary expenses. She was fired to reduce salary expenses. So at a minimum, even if there are allegedly some other reasons, and Judge Berrigan specifically says she was suspect as to whether or not there were any other motivating factors. At a bare minimum, it is clear that she did not, could not create a genuine issue of material fact to preclude summary judgment under the but-for causation. Your honor. How would a plaintiff, in your mind, under the but-for, it's got to be determinative. How would a plaintiff, where there are emails back and forth saying, you got to get out of, I'm not saying these are your facts, got to get out of jury duty. How are they going to meet that standard? Your honor, may I respond briefly? Bottom line is, in this particular case, the emails at issue all occurred way early on, eight months prior to, so there's no temporal proximity whatsoever. Second of all, obviously, as the Supreme Court stated in Burlington, context matters. Context of people's communications with each other in the workplace matter. And it is clear by the context that no one told Ms. Rogers to lie. In fact, she concedes that while she tries to, may I finish the sentence, your honor? While she attempts to assert that it was insinuated that she lied, she concedes in her deposition that she was not told to lie during the voir dire questioning. Defendants' appellees respectfully request that this Honorable Court affirm the summary judgment ruling in their favor. And that this case be dismissed with prejudice. Thank you, your honors. Thank you, Ms. Boyle. Mr. Kansas. I think most of what I want to say at this point is, preface by at this stage when we're talking about summary judgment, denying the plaintiff the right to go to try and prove her case. That the reasonable inferences about the facts must be drawn in favor of the non-movement. So we spent a bunch of time talking about the impact of the grand jury service and whether or not there was really an impact, that there was a low volume of closings. Well, if Ms. Rogers wasn't there on Friday, which was the most popular day for a closing, that certainly wasn't going to help the low volume of closing. They talked about, Ms. Opposing Counsel says that there was no specific instance when the closing had to be rescheduled. But if you look, or when a closing couldn't be done, if you look closely at the question that was posed to Ms. Rogers is, can you recall a specific instance when a closing had to be rescheduled? And because you can't set any closings until Wednesday evening, there were no closings ever scheduled for Friday. So- Every closing I've ever had on any piece of property, they've rescheduled the closing. And they might give you one day's notice. It just happens. Friday, and this was testified to by Ms. McAdam, who is the manager of the Ladder Bloom Agency, that Friday was the most popular day for closing. And yet, the defendants continuously say that there was no evidence that Friday was any more popular than the other days. And what they're asking you to do is to weigh the facts. And that's not what we're here to do. And with regard to the impact of the closing and the timeline, after Ms. Rogers' service was extended in the middle of February, and these are in the record, Mr. Uncoff, the person just mentioned as the guy she needed to go to if she had a problem, came to her and said about the jury duty as it came up in the discussion, couldn't you have gotten out of that? This was in February, I believe. Then his assistant asked Ms. Rogers, told Ms. Rogers, you could have gotten out of that, you know. And Ms. Rogers testified without specificity that there were numerous instances over the period where her co-workers were disappointed with her because she couldn't schedule things, because she wasn't sure that she was going to be there. If you don't weigh the facts, and you apply the proper summary judgment standard, and the reasonable inferences are drawn in favor of the non-movement, then there was a great burden. By bringing in equity to do these closings, that meant that the Lather and Bloom real estate agents would set up a closing with platinum, and then the closing would happen, and an equity attorney would show up. And meanwhile, there's evidence that right up until the time Ms. Rogers was terminated, that the bosses, the TRG and Lather and Bloom bosses, did not want the Lather and Bloom agents to know that equity and platinum were part of the same company. So the only backup that Ms. Rogers had for Fridays that council pointed to would have exposed to these agents that these two companies that they were presenting as separate companies really were connected, really were part of the same company. So there was a burden. With regard to the monster.com posting, there is a posting that says, November 2011, closing officer for Vanderville. Ms. Rogers, and I don't know if it's all in the record. I think if you look at the record, the issue that she's talking about is, we're supposed to have an attorney work in this office. When I was here before with platinum, it was me and Ms. Lauderdale and an attorney to help us answer questions, to help us resolve title issues. We don't have an attorney now. Is that going to happen? This position that was posted on monster.com was for just a closing officer, not an attorney. Finally, with regard to the actual termination itself, and this is probably one of the most pressing pieces of evidence we have. After this incident on April 18th, Mr. Mullen with TRG says that Mr. Haas called him, or they spoke on the phone, and Mr. Haas said, if she did it again, this is unacceptable. Something has to be done. We need to take action. And Mr. Mullen then called HR and told them to terminate Ms. Rogers. Mr. Haas said he'd never talked to Mr. Mullen about Ms. Rogers' statement or about terminating her until after she had already been terminated. He wasn't part of the decision. That's conflicting testimony on a very key issue. I talked to the customer. He said, we had to terminate her. Customer says, I didn't see, I didn't talk to him about- Is that one of the facts you listed as? Yes. All right. Thank you. All right, this concludes our docker for the week.